IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| | *   Criminal No. WMN-06-0135 |
| JOHN GERALD BERMUDEZ | *   Civil Action No. WMN-09-125 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

On August 2, 2007, after a four day trial, a jury found Defendant John Gerald Bermudez guilty of assaulting his supervisor at the United States Postal Service (USPS) in violation of 18 U.S.C. § 111(a)(1)&(b).  Defendant was sentenced on January 18, 2008, to a term of 10 months imprisonment, followed by a 3 year term of supervised release.  Defendant filed a timely appeal of his conviction but, as will be explained below, later moved to dismiss that appeal.  The appeal was dismissed on April 3, 2008.

Defendant has now filed a "Motion under § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.[1]  Paper No. 146.  The government has responded to the motion.  Upon review of the pleadings and the applicable case law, the Court finds no merit in Defendant's claims and that they should be dismissed, without a hearing.  See 28 U.S.C. § 2255 (providing that a hearing is not required "where the motion and the files and records of the case conclusively show that the

---

[1] While Defendant had completed his term of imprisonment prior to filing this motion, it is well established that "[a] prisoner on supervised release is considered to be 'in custody' for purposes of a § 2255 motion." United States v. Pregent, 190 F.3d 279, 283 (4th Cir. 1999).

prisoner is entitled to no relief").

Defendant raises the following challenges to his conviction: (1) that the government failed to disclose evidence favorable to his case; (2) that his trial counsel provided ineffective representation by failing to timely interview a witness, by failing to call another witness, and in the manner in which he selected the jury; (3) that he was denied his right to appeal; and (4) that the jury deliberated in an improper manner.  The Court will address these contentions seriatum but, before doing so, must briefly review the nature of the charge brought against Defendant and the evidence that was presented at trial.

The charge arose out of an assault on postal employee Wayne Brock on the afternoon of February 8, 2006, in the platform area of the USPS Linthicum, Maryland facility.  At trial, the government called 6 witnesses,[2] all USPS employees, who testified that they saw both Defendant and Defendant's brother, Gregory Bermudez, kicking and/or punching Brock as he lay on the ground.[3] According to the testimony of these witnesses, the assault was stopped when co-workers pulled Defendant and Gregory Bermudez off of Brock.  One of the government witnesses, Kevin Laws,

---

[2] Cynthia McDaniel, Valiant Floyd, Kevin Laws, Lisa Carr, Minerva Bernier, and James Hammond.

[3] Gregory Bermudez was also charged with assault and entered a guilty plea shortly before the scheduled trial.  He was sentenced on January 18, 2008, to a term of 8 months imprisonment, followed by a two-year term of supervised release.

testified that he pushed Defendant off of Brock and, shortly thereafter, was himself attacked by Gregory Bermudez. Laws testified that while he was being choked by Gregory Bermudez, Defendant was encouraging the attack.

The defense called four witnesses, including Defendant and James Francis, a USPS employee. Defendant testified that he never struck Brock but, instead, attempted to act as a peacemaker. Defendant also testified that he pulled his brother off Brock. Francis testified that, while he saw one person kicking another individual who was on the ground in the platform area, he was unable to see who was doing the kicking or even if it was only a single assailant because his view was blocked by other employees crowding around the scene. Francis also testified that he had no knowledge as to Defendant's whereabouts while Brock was being assaulted. Regarding the subsequent confrontation with Laws, Francis did testify that he observed Defendant more or less "acting as a peacemaker" and attempting to get his brother to leave the platform area, which he eventually was successful in doing. 8/1/2009 Tr. at 76-77.

In arguing that the government withheld evidence favorable to his case,[4] Defendant points to a report of a June 6, 2006,

---

[4] Because this claim could have been pursued on direct appeal, it would be procedurally defaulted in the absence of clear and convincing evidence of actual innocence. See United States v. Mikalajunas, 186 F.3d 495, 492-93 (4th Cir. 2007). Because Defendant also argues that the government interfered with his right to appeal, however, the Court will briefly address the merits of this claim.

interview of James Francis conducted by P.C. Price, a private investigator hired by counsel for Gregory Bermudez.  Price stated in his report that Francis had told him that he saw "Greg kicking someone who was on the ground in the doorway and his brother John pulling him away."  According to Price's report, Francis also stated that "he had given a statement to the inspectors concerning what he had witnessed."  Based upon those statements, Defendant concludes that he is "100% sure" that Francis told the inspectors that it was Defendant who pulled Gregory off Brock.

Absent from Defendant's motion, however, is any evidence that Francis ever told the government that Defendant attempted to pull his brother away from Brock.  Defendant did attach to his motion a handwritten statement that Francis provided to the Postal Inspectors on the date of the incident.  In that statement, Francis related that, <u>after</u> the Brock assault, Defendant helped break up a "scuffing match" <u>between Gregory Bermudez and Laws</u> and Defendant then convinced Gregory to leave the facility.  Francis makes no mention, however, of Defendant intervening in the assault on Brock.  Francis's trial testimony was generally consistent with his handwritten statement.

In the absence of some evidence that Francis told the Postal Investigators that Defendant tried to pull Gregory off Brock, the Court cannot conclude that the government breached a

duty to disclose favorable evidence. Francis's written statement would, in fact, undermine any conclusion that he made such a statement to the investigators.

Defendant next cites a number of examples where he was dissatisfied with the performance of his trial counsel. To establish a claim of ineffective assistance of counsel, however, a petitioner must show that counsel's performance was constitutionally deficient to the extent that it fell below an objective standard of reasonableness, and that he was prejudiced thereby. Strickland v. Washington, 466 U.S. 668, 687-91 (1984). In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Id. at 689; see also Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297-99 (4th Cir. 1992). Furthermore, the petitioner "bears the burden of proving Strickland prejudice." Fields, 956 F.2d at 1297. "If the petitioner fails to meet this burden, a reviewing court need not consider the performance prong." Fields, 956 F.2d at 1297 (citing Strickland, 466 U.S. at 697). In considering the prejudice prong of the analysis, the Court may not grant relief solely because the petitioner can show that, but for counsel's performance, the outcome would have been different. Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). Rather, the Court "can only grant relief under . . . Strickland if the 'result of

the proceeding was fundamentally unfair or unreliable.'" Id. (quoting Lockhard v. Fretwell, 506 U.S. 364, 369 (1993)).

Defendant first contends that his counsel was ineffective because he failed to interview Francis prior to trial. Defendant states that, on the first day of trial, he observed his counsel show Francis the report Price prepared after the June 6, 2006, interview.  Francis apparently did not remember the events as detailed in Price's report, particularly as to the assertion that it was John that pulled Gregory away from the man on the ground.  In Defendant's view, Francis's testimony was not as favorable to his case as he believed it would be.[5]

Defendant has not shown, however, how an earlier interview of this witness by counsel would have changed this witness's testimony or, more significantly, the outcome of the trial. Francis gave sworn testimony at trial that was consistent with his own statement given immediately after the incident.  There is no reason to believe that counsel would have convinced Francis to adopt the version of events that Price reported him giving four months after the event.  Regardless, had Francis testified as Defendant hoped, there is no reason to conclude that the jury would have credited his testimony over that of the six witnesses that testified that Defendant participated with Gregory in kicking and punching Brock.

---

[5] Defendant was clearly disappointed with Francis's testimony as he shouted out in the courtroom as Francis was leaving the stand, "It's my life, James. Tell the truth." 8/1/2007 Tr. at 86.

6

Defendant also suggests that, once his counsel discovered that Francis would not testify as expected, counsel should have opted not to call him as a witness.  Francis's testimony, however, was not harmful to Defendant and he did testify that he observed Defendant acting "more or less" as a peacemaker. 8/1/2007 Tr. at 77.  The Court cannot conclude that the decision to call Francis prejudiced Defendant.

Defendant next faults his trial counsel for not calling Price as a witness once Francis did not testify as Defendant anticipated.  Defendant states that he requested that counsel do so but counsel responded that Price's testimony would be inadmissible as hearsay or, if admissible at all, could only be used for impeachment purposes and counsel was reluctant to impeach his own witness.  Again, the Court cannot conclude that Price's testimony, to the extent it would have been admissible, would have overcome the overwhelming evidence against Defendant.

Defendant's last contention concerning the ineffectiveness of his trial counsel is that "he totally disregarded [Defendant's] choice of jurors."  Defendant provides no specific concerns about the selection of jurors and, as the government correctly notes, "[o]n habeas review, federal courts generally accord particular deference to the judgment of trial counsel during voir dire."  Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007) (internal quotations omitted).  The Court finds no basis to conclude that trial counsel's performance in this

7

regard was constitutionally deficient, or that the selection of jurors altered the outcome of the trial.

Next, Defendant argues that he was denied the right to appeal. Defendant explains that, after he filed the appeal of his conviction, he learned from the public defenders' office that, if he continued to pursue his appeal, the government would cross-appeal Defendant's sentence, as well as the sentence imposed upon his brother Gregory. While Defendant asserts it "did not bother him one bit" that the government might appeal his sentence, he wanted his brother to "move on with his life." To protect his brother, Defendant moved to dismiss his own appeal. He now asserts in his motion that the government's conduct was "pretty low" and that the government violated his right to appeal by using his brother.

The Court can understand why Defendant might view the government's conduct as vindictive. The federal appellate rules, however, anticipate such a sequence of events. Once <u>any</u> Defendant appeals his conviction, the government is given 30 days to decide if it wishes to cross-appeal. Fed. R. App. P. 4(b)(1)(B)(ii). Courts have frequently cautioned that "defendants, who benefit from favorable calls under the federal sentencing guidelines, should think more than twice about appealing their cases when their appeals have little likelihood of success ... because a defendant's appeal may draw a guidelines cross-appeal when the government would [probably] not

... appeal on its own in the first instance." United States v. Bradley, 165 F.3d 594, 595 (7th Cir.1999); See also United States v. Szarwark, 168 F.3d 993 (7th Cir. 1999).  Courts have recognized that co-defendants can also suffer the consequences of another defendant's decision to file an appeal.  See United States v. Meza-Urtado, 351 F.3d 301, 302 (7th Cir. 2003) (opining that defendant's appeal was "especially bad news" for co-defendant whose sentence under a downward departure was also vacated).

In the government's defense, once it determined to cross appeal Defendant's sentence, as was its right, it could be seen as unfair not to also challenge Gregory's sentence.  Gregory, who was certainly the more culpable of the two brothers, already benefitted from a sentence lighter than that imposed on Defendant.  To seek to increase Defendant's sentence without also seeking to increase Gregory's would only compound that inequity.  In short, the Court finds that Defendant was not unlawfully denied his right to appeal.

Finally, Defendant contends that the jury rushed to its verdict.[6]  After deliberating for about two hours, the jury sent out a note indicating that it was unable to reach a verdict.  The Court gave an Allen charge[7] and, as the jury was going back

---

[6] This is also a claim that could have been raised on direct appeal and thus, was procedurally defaulted.

[7] An Allen charge, based on the Supreme Court's decision in Allen v. United States, 164 U.S. 492 (1896), is "[a]n instruction

into the jury room to continue deliberations, a juror mentioned to the courtroom deputy that she had to leave town at a certain time for a family vacation.  The Court, after consultation with counsel, determined to speak with that juror to determine how to proceed but, when the courtroom deputy went in to the jury room to get that juror, he was told that the jury was working towards a decision.  The jury submitted a note shortly thereafter indicating that it had reached a verdict.  Defendant opines that the jury must have rushed its decision in response to pressure from the juror that wanted to "get to the beach on time."

Again, the Court can understand how Defendant might be distressed that a juror was thinking about vacation plans at a time when his liberty interests were at stake.  Nevertheless, there is no indication that the jury did not properly reach its decision.  When polled, each juror agreed that the verdict given was their verdict as well.  In the absence of some evidence to the contrary, the court must assume that the jury followed the Court's instructions concerning proper deliberations.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985)(courts can "presume[] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them. . . .  [W]e

---

advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument."  United States v. Seeright, 978 F.2d 842, 845 (4th Cir. 1992).

adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.").

For these reasons, Defendant's motion must be denied.  A separate order will issue.

```
                    _____/s/_____
                    William M. Nickerson
                    Senior United States District Judge
```

DATED: October 15, 2009.